<u>**FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SUNY RODRIGUEZ ALVARADO, and A.S.R., a minor,** *Plaintiffs,* v. **UNITED STATES OF AMERICA,** *Defendant.* | Civil Action No. 16-5028 OPINION |

This matter comes before the Court by way of the United States' (the "Government") motion to transfer the matter to either the Southern or Western District of Texas. Dkt. No. 17. Plaintiffs Suny Yaneth Rodriguez Alvarado ("Ms. Rodriguez Alvarado") and her child, A.S.R. (together, "Plaintiffs"), oppose the motion. Dkt. No. 21. For the reasons set forth below, the Government's motion is **DENIED**.

**I.  BACKGROUND**

In this Federal Tort Claims Act case, Plaintiffs seek damages for injuries sustained at the hands of federal Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE") officers when they entered the United States to seek asylum.

Plaintiff Suny Rodriguez Alvarado and her son, A.S.R., are citizens of Honduras. Compl. ¶ 7. Ms. Rodriguez Alvarado was born in Honduras in 1976, and resided in the United States lawfully for a number of years from 1998 to 2006. <u>Id.</u> ¶¶ 36-39. In 2004, Honduran police officers killed Ms. Rodriguez Alvarado's mother, an outspoken police critic, along with her stepfather. <u>Id.</u> ¶ 38. Ms. Rodriguez Alvarado returned to Honduras in 2006 to investigate their deaths. <u>Id.</u> ¶ 39.

1

She was met with intimidation, harassment, and extortion by the Honduras police, which culminated in a physical attack outside her home in September 2014. Id. ¶¶ 41-42.

In November 2014, Ms. Rodriguez Alvarado, A.S.R., and A.S.R.'s father, Jose Rafael Sanchez Villatoro ("Mr. Sanchez") fled Honduras for the United States. Id. ¶ 45. While en route, Mexican authorities arrested them and returned them to Honduras. Id. Ms. Rodriguez Alvarado, Mr. Sanchez, and A.S.R. made a second attempt to flee Honduras, arriving in Texas after crossing the U.S.-Mexico border on January 16, 2015. Id. ¶ 46. CBP apprehended the Rodriguez Alvarado-Sanchez family, and detained them at the South Texas Family Residential Center in Dilley, Texas ("Dilley") from January 19, 2015 until May 14, 2015. Id. ¶¶ 83-84.

Plaintiffs allege that they were mistreated by CBP and ICE officers through the duration of their time in custody in violation of federal regulations. Specifically, they allege that Government officials: (1) placed Plaintiffs in inhumane, cold, and crowded conditions in violation of CBP's own minimum standards for operation, id. ¶¶ 59-64; (2) attempted to coerce Plaintiffs to agree to removal by making constant threats of deportation, id. ¶¶ 70, 74, 87-90; (3) attempted to place A.S.R. in a shelter for unaccompanied minors, id. ¶¶ 113-27; (4) regularly disrupted Plaintiffs' sleep by keeping the lights on, id. ¶¶ 128-32; (5) refused to share information about Mr. Sanchez with Plaintiffs, id. ¶¶ 140-43; and (6) inhibited Ms. Rodriguez Alvarado's access to counsel, id. ¶¶ 144-48.

Ms. Rodriguez Alvarado sought withholding of removal, which was granted on May 14, 2015, by Immigration Judge Lourdes Rodriguez De Jongh. Id. ¶ 155. Plaintiffs were released from Dilley that day, and joined their relatives in New Jersey. Id. ¶ 156. On October 1, 2015, Mr. Sanchez was granted protection from removal under the Convention Against Torture in

Pearsall Immigration Court. Id. ¶ 158. Three months after that, on January 19, 2016, A.S.R. was granted asylum in Newark Immigration Court by Immigration Judge Leo Fink. Id. ¶ 159.

Plaintiffs filed administrative claims pursuant to the FTCA for their alleged mistreatment at the hands of CBP and ICE officers acting under the supervision of the Department of Homeland Security ("DHS"). Id. ¶ 162. DHS denied the claims on February 25, 2016. Id. ¶ 163. Plaintiffs subsequently initiated the instant action on August 17, 2016. Plaintiffs assert the following five causes of action pursuant to the FTCA: (1) abuse of process; (2) false imprisonment; (3) intentional infliction of emotional distress; (4) negligent supervision; and (5) negligence. Id. ¶¶ 165-210. Defendants now seek dismissal for improper venue, or—in the alternative—transfer of venue.

## II. Discussion

### A. Whether Venue is Proper in New Jersey

The Government first contends that venue is improperly laid in New Jersey as to Plaintiff Ms. Rodriguez Alvarado because, as an alien, she cannot establish residency in the forum.[1] The Court disagrees.

1. Residence

In a Rule 12(b)(3) motion, the moving party bears the burden of proving that venue is improper. See Myers v. Am. Dental Ass'n, 695 F.2d 716, 724-25 (3d Cir. 1982). FTCA actions against the United States "may be prosecuted only in the judicial district where the plaintiff *resides* or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b) (emphasis added).

---

[1] While arguing that A.S.R. does not yet have LPR status, and is therefore not a resident under the venue statute, the Government does not challenge venue on this basis because having been granted asylum, A.S.R. "will become eligible to apply for LPR status in January 2017." Def.'s Br. at 4 n.1. The Government maintains that because Ms. Rodriguez Alvarado's case is not properly venued in this district, the entire case should be transferred to Texas pursuant to 28 U.S.C. § 1404. Id.

3

The parties dispute the meaning of "resides." As Section 1402 does not define residence, the Court looks to the general venue statute, 28 U.S.C. § 1391, which does. Section 1391's provision on residency states that for venue purposes, "a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled." 28 U.S.C. § 1391(c)(1).[2]

Plaintiffs contend that the plain reading of this provision allows any non-citizen to establish venue in a forum where he or she is domiciled. Pls.' Opp'n at 5-6. Defendants contend that Section 1391(c)(1) should be narrowly read only to permit non-citizens who are Legal Permanent Residents ("LPR") to establish residency where he or she is domiciled. The Court agrees with Plaintiffs.

The plain text of 1391(c)(1) authorizes *all* non-citizens—regardless of LPR status—to establish residency where they are domiciled. The clause provides "*a natural person* . . . shall be deemed to reside in the judicial district in which that person is domiciled." The ordinary meaning of "natural person" is an individual. See FCC v. AT&T Inc., 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically give the phrase its ordinary meaning.") (citations omitted); Mohamad v. Palestinian Authority, 566 U.S. 449, 454 (2012) (recognizing that "this Court routinely uses 'individual' to denote a natural person"). The statute here does not limit the term "natural persons" in any way, and thus includes *all* natural persons. "When Congress intend[s] to exclude . . . it [says] so." Flores v. United States, 108 F. Supp. 3d 126, 130 (E.D.N.Y.

---

[2] As both Section 1391 and Section 1402 contain the phrase "where plaintiff resides," and are part of the same Title, they must be read consistently. See Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 479 (1992) (applying the "basic canon of statutory construction that identical terms within an Act bear the same meaning.").

2015) (holding that the plain meaning of Section 1391(c)(1) indicates that "[a]lienage is not a reason stated in the statute as a basis for finding persons outside its reach").

The Government argues that the clause "including an alien lawfully admitted for permanent residence in the United States," limits the scope of Section 1391(c)(1) to LPRs alone. The Government contends that this clause would be superfluous had Congress meant the term "natural persons" to include all individuals regardless of LPR status. But a more plausible reading—the one that is plain on its face—is that LPRs are merely an illustrative example of "natural persons." "[T]he term 'including is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." Federal Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941) (citing Phelps Dodge Corp. v. Nat'l Labor Relations Bd., 313 U.S. 177, 189 (1941)). Here, the general principle is that "natural persons" can establish residency where they are domiciled, and individuals with LPR status are merely an illustrative example of natural persons.

Where a statute is unambiguous on its face, no further inquiry is necessary. Nwozuzu v. Holder, 726 F.3d 323, 327 (2d Cir. 2013). But even if Section 1391(c)(1) was ambiguous, Plaintiffs' reading of the text is supported by its legislative history. Congress adopted the Federal Courts Jurisdiction and Venue Clarification Act of 2011 (the "Act") to resolve a circuit split over whether "residence" has the same meaning as "domicile" as used in Section 1391. H.R. Rep. 112-10, at 20-21 (Feb. 11, 2011) (citing 15 WRIGHT & MILLER, Federal Practice and Procedure: Jurisdiction and Related Matters at 33–37 (2d. ed. 1986)). Before 2011, a minority of circuits permitted individuals to establish residence in multiple locations, while others limited residence to where an individual is domiciled. Id. Under either rule, individuals who were not domiciled in the United States were unable to mount a venue defense in actions brought against them. As such,

5

all non-citizens were considered non-domiciliaries, and so were unable to establish venue under 1391. See Arevelo-Franco v. I.N.S., 889 F.2d 589, 590 (5th Cir. 1990) (noting "federal courts have interpreted [Section 1391] to deny venue to aliens, holding that for purposes of venue, aliens are not residents of any district despite where they live"); Williams v. United States, 704 F.2d 1222, 1225 (11th Cir. 1983) ("An alien, for purposes of establishing venue, is presumed by law not to reside in any judicial district of the United States . . . ."); Blacher v. Ridge, 436 F. Supp. 2d 602, 608 (S.D.N.Y. 2006) ("Although [plaintiff] resides in this District, she is an alien and has no residence for venue purposes.").

The Act clarified the venue statute by explicitly adopting the majority rule in its new provisions on residency. The House Judiciary Committee Report (the "Report") states, "1391(c)(1) would provide that, for venue purposes, a natural person would be deemed to reside in the judicial district in which that person is domiciled, thereby resolving the division of authority regarding the residence of parties by adopting the majority rule." Id. at 21. While Congress acknowledged that the modification would "permit permanent resident aliens domiciled in the United States to raise a venue defense," Id. at 23, it does not distinguish between the application of the statute to LPRs and to non-citizens without LPR status. Id. Notably, the only mention of non-LPR aliens in the Report suggests that Congress was aware that non-LPRs could establish domicile in the United States. In a footnote, the Judiciary Committee acknowledges "[a]n alien can obtain a 'lawful domicile' in the United States only if he or she has the ability under the immigration laws to form the intent to remain this country indefinitely.'" Id. at 23 n. 16 (quoting Castellon-Contreras v. I.N.S., 45 F.3d 149 (7th Cir. 1995)). In sum, the legislative history confirms that Congress intended that domicile, regardless of LPR status, governs an individual's ability to establish residence, and therefore venue.

6

2. Domicile

The Government next disputes whether Plaintiff Ms. Rodriguez Alvarado is properly "domiciled" in New Jersey. The Government argues that Ms. Rodriguez Alvarado is not domiciled in this district because her non-LPR status means that "she cannot show that she has an intent to remain the United States indefinitely." Def.'s Reply at 3. The Court again disagrees.

"An alien can obtain a 'lawful domicile' in the United States only if he or she has the ability under the immigration laws to form the intent to remain in this country indefinitely." H.R. Rep. 112–10, at 33 n.16 (citing Castello-Contreras v. I.N.S., 45 F.3d 149 (7th Cir. 1995)). Ms. Rodriguez Alvarado became lawfully present in the United States when she was granted a withholding of removal. 8 U.S.C. § 1182(a)(9)(B); see also USCIS Adjudicator's Field Manual § 40.9(b)(3)(K) ("Accrual of unlawful presence stops on the date that withholding or deferral is granted and continuous through the period of the grant."). Individuals who have received withholding of removal enjoy some privileges of others who are lawfully present. These privileges include the authority to work, 8 C.F.R. § 274a.12(a)(10), and the ability to register for health insurance on the federal marketplace, 45 C.F.R. § 600.5. Ms. Rodriguez Alvarado is "settled in the community of West New York, New Jersey" and "intend[s] to continue living" there with her family. Rodriguez Alvarado Aff. ¶¶ 5-7. Although a withholding of removal is a right not be removed to a specific country rather than an unqualified right to remain in the United States, Abdulai v. Ashcroft, 239 F.3d 542, 545 (3d Cir. 2001), it does not lapse after a set amount of time.[3]

---

[3] Withholding of removal status may only be terminated if there is a showing of fraud in the alien's application, if there is a "fundamental chance in circumstances relating to the original claim" such that "the alien's life or freedom no longer would be threatened," or if the alien commits any other act that would have been grounds for denying her original application. 8 C.F.R. § 208.24(b)(1)-(2).

Accordingly, Ms. Rodriguez Alvarado is lawfully present in New Jersey, and has exhibited an intent to stay here indefinitely.

Plaintiffs' position is also consistent with the long established principle that physical presence is the hallmark of domicile for venue purposes. See Midwest Transit, Inc. v. Hicks, 79 Fed. Appx. 205, 207 (7th Cir.2003) ("[d]omicile has two elements: (1) physical presence or residence in a state and (2) an intent to remain in the state"); Lew v. Moss, 797 F.3d 747, 750 (9th Cir.1986) (same). Furthermore, the Government's position would render the distinction that courts have made between LPRs and non-LPRs unnecessary. Courts have recognized that non-LPR aliens can establish domicile so long as they show a lawful intent to remain in the United States. See Elkins v. Moreno, 435 U.S. 647, 666 (1978) ("Congress . . . was willing to allow nonrestricted nonimmigrant aliens to adopt the United State as their domicile."); Lok v. I.N.S., 681 F.2d 107, 109 (holding that "the Supreme Court ruled that an alien did not have to be a permanent resident to harbor a lawful intent to remain. Thousands of aliens could become lawful domiciliaries without becoming permanent residents under Elkins."). In other words, non-LPRs may also establish domicile. There would be no need for this distinction if only LPRs can establish domicile.

The Government argues that Ms. Rodriguez Alvarado's immigration status is insufficient because she is legally ineligible to become an LPR. But this position conflates unlawful *status* with unlawful *presence*. The Government does not present any cases suggesting that only those with lawful *status* may establish an intent to remain in the United States indefinitely. The Court is instead persuaded by cases set forth by Plaintiff finding that lawful *presence* is all that is required. For example, in Flores v. United States, a United States District Court held that a citizen of El Salvador with a pending application for asylum is lawfully present in the United States, and was thus able to establish domicile in the Eastern District of New York in an FTCA action. 108

8

F. Supp. 3d at 130. Like Flores, Ms. Rodriguez Alvarado's status is one that is deemed *not* to be unlawfully present. Id. at 129. Ms. Rodriguez Alvarado, like the petitioner in Flores, has also decided to make the forum her permanent residence.[4] Because Ms. Rodriguez Alvarado is domiciled in the District of New Jersey, she may sue in this Court.[5]

### B. Whether the Court Should Transfer the Action to the Southern or Eastern District of Texas.

The Government argues that even if venue is proper in the District of New Jersey as to Ms. Rodriguez Alvarado's claims, it is in the public interest for the claims to be transferred to Texas. The Court again disagrees.

Defendants filed the instant motion pursuant to 28 U.S.C. § 1404(a), which applies where the current forum is proper but an alternative forum is arguably more convenient. Section 1404 provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Courts have "broad discretion in making determinations under Section 1404(a), and convenience

---

[4] The Government relies on two decisions to support its argument that Ms. Rodriguez Alvardo is not domiciled in the District of New Jersey: Aguilar v. United States, No. 15-986 (E.D. Va. Feb. 26, 2016) and Najera v. United States, No. 16-459, 2016 WL 6877069 (E.D. Va. Nov. 22, 2016). In both cases, courts in the Eastern District of Virginia granted the Government's motion for transfer on the basis that the plaintiffs could not establish domicile in Virginia. The Court is not persuaded. The Aguilar court granted the Government's motion to transfer in a brief, on-the-record hearing without providing any analysis. The Najera court held that Section 1391(c) only authorizes LPRs to establish residence where they are domiciled. 2016 WL 6877069, at *6-7. However, the court's analysis did not consider the plain meaning of Section 1391(c). Id. This Court declines to follow the Najera court's analysis because "[w]here statutory language is unambiguous, the court should not consider statutory purpose or legislative history." In re Philadelphia Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010).

[5] Plaintiffs contend that, regardless of whether Ms. Rodriguez Alvarado is deemed to be domiciled in New Jersey, venue is proper in this forum because Co-Plaintiff A.S.R. is domiciled here, and the venue statute "imposes only a minimal residence requirement in multi-plaintiff cases." Pls.' Opp'n at 13. Because the Court finds that Ms. Rodriguez Alvarado may establish domicile in New Jersey, it does not reach the issue of whether proper venue as to one plaintiff satisfies venue as to all plaintiffs in a multi-plaintiff litigation.

and fairness are considered on a case-by-case basis." Linwood Trading Ltd., No. 14-5782, 2015 WL 5098117, at *1 (D.N.J. Aug. 28, 2015). The burden of establishing the need for a venue change lies with the party seeking the transfer. Shutte v. Armco Steel Corp., 431 F.2d 22 (3d Cir. 1970).

As a threshold matter, the Court must determine "whether the transferee district has proper jurisdiction and venue, such that the case could have been brought in the transferee district in the first instance." Telebrands Corp. v. Mopnado, No. 14-7969, 2016 WL 368166, at *10 (D.N.J. Jan. 12, 2016). Next, courts conduct a balancing test, which takes a number of private and public interest factors into consideration. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). The private interest factors include: (1) plaintiff's choice of forum; (2) defendant's choice of forum; (3) whether the claim arose elsewhere (4) convenience of the parties as indicated by their relative physical and financial condition; (5) availability of compulsory process over unwilling witnesses; and (6) the location of books and records. Id.; Seghers v. Executive Risk Indemnification, Inc., No. 06-628, 2006 WL 2865494, at *6 (D.N.J. Oct. 5, 2006). The public interest factors include: (1) enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) local interest in deciding local controversies at home; (4) public policies of the fora; and (4) familiarity of the trial judge with the applicable state law. Jumara, 55 F.3d at 879.

Here, the parties do not dispute that either the Western or Southern District of Texas is a viable forum. Accordingly, the Court will discuss the remaining Jumara factor below.

1. Private Interest Factors

    a. Parties' Choice of Forum

"[I]n ruling on defendants' motion the plaintiff's choices of venue should not be lightly disturbed." Jumara, 55 F.3d at 879 (citing 1A Pt. 2 MOORE'S ¶ 0.345[5] at 4360). The Plaintiff's choice is "entitled to greater deference when a plaintiff chooses its home forum." Wm. H. McGee Co., Inc. v. United Arab Shipping Co., 6 F. Supp. 2d 283, 289 (D.N.J. 1997) (internal citations omitted). Here, Plaintiffs chose to commence this action in their home district. Rodriguez Alvarado Aff. ¶¶ 4-7.

The Government favors Texas. As it correctly contends, "when the central dispute in a lawsuit arose from events that occurred almost exclusively in another forum . . . courts give substantially less weight to the plaintiff's forum choice. Janosko v. United of Omaha Life Insurance Company, 16-1137, 2016 WL 4009818, at *3 (D.N.J. July 25, 2016). Here, the alleged tortious conduct took place while Plaintiffs were in CPB and ICE custody in Texas.

Because there are only limited material connections between the events underlying this action and the District of New Jersey, Plaintiffs' choice of forum is accorded diminished weight, and will be considered in light of the other Jumara factors.

  b. Whether the Claim Arose Elsewhere

Nearly all the facts at issue in this matter arose in Texas. Plaintiffs were apprehended and detained there after entering the United States through a section of the U.S.-Mexican border located in the Southern District of Texas. At the same time, a few facts occurred in New Jersey. For example, A.S.R.'s aunt made efforts from New Jersey to take custody of A.S.R. while he was in Texas. Compl. ¶ 113.

On balance, because the alleged tortious conduct occurred outside New Jersey, this factor favors transfer.

  c. Convenience of the Parties

A transfer is disfavored where it "merely shifts the burden of litigating in a disfavored forum to the plaintiff." NCR Credit Corp. v. Ye Seekers Horizon, Inc., 17 F. Supp. 2d 317, 322 (D.N.J. 1998). The Government's sole contention that litigation in New Jersey would be inconvenient for it is that requiring its employee witnesses to travel to New Jersey "is burdensome" and "would detract from their public duties." Def.'s Br. at 20. Plaintiffs contend that they would face far greater burdens by litigation in Texas. They explain how transferring this action to a Texas district would cause both financial hardship and medical harm. Pls.' Opp'n at 21-23.

First, a transfer would impose such a financial burden on Plaintiffs that it would indeed shift the burden of the case from the Government to Plaintiffs. A transfer would take Ms. Rodriguez Alvarado away from her job at a clothing warehouse in Secaucus, New Jersey, where she is paid an hourly wage of $9.50. Rodriguez Alvarado Decl. ¶ 10.

Second, a transfer could cause Plaintiffs to suffer psychological and medical harm. Returning to Texas, the site of the alleged mistreatment would force Plaintiffs to relive their trauma. Id. ¶ 13. Plaintiffs support their contentions with statements from doctors. After evaluating Ms. Rodriguez Alvarado, Dr. Favio Casoy concluded that her return to Texas would cause her to relive her traumatic experiences. Casoy Decl. ¶ 24, Dkt. No. 21-3. Furthermore, a change in venue would exacerbate A.S.R.'s separation anxiety disorder and post-traumatic stress disorder. Posner Decl. ¶ 19, Dkt. No. 21-2.

Lastly, a transfer would also limit Ms. Rodriguez Alvarado's ability to care for other family members in New Jersey. She has two teenaged children besides A.S.R. to care for. Rodriguez Alvarado Decl. ¶ 1. All three are in school. Id. ¶ 9.

Because Plaintiffs reside in New Jersey, and would experience significant hardship if they were to litigate this case in Texas, this factor weighs strongly in favor of the District of New Jersey.

d. Convenience of the Witnesses

The Government contends that all of its witness are based in Texas, and are thus outside the reach of courts in New Jersey. This is not the case. The Government only points to witnesses who are employed by a private government contractor, the Corrections Corporations of America ("CCA"). Although the Complaint alleges wrongdoing by CCA, see Compl. ¶ 84, it also alleges wrongdoing by ICE and CPB officials, id. ¶¶ 74-82, 86-99. As federal employees, these witnesses may be compelled to testify by the Government. Certain Underwriters at Lloyd's London, 14-4717, 2015 WL 1182764, at *3 (E.D.N.Y. Mar. 13, 2015). Moreover, to the extent that it is inconvenient for federal employees to travel to New Jersey, the Court may permit them to participate by video deposition.

In contrast, Plaintiffs have identified specific individual witnesses who will be inconvenienced by a transfer to Texas. These witnesses include A.S.R.'s aunt Lourdes Sanchez, a New Jersey resident who will testify about her efforts to secure A.S.R.'s release, and Plaintiffs' expert witness, Dr. Flavio Casoy, a New York resident. See Robinson v. Air Liquid Sys. Corp., No. 11-4078, 2014 WL 3735338, at *2, n.4 (D.N.J. July 28, 2014) ("The convenience of the witnesses (including expert witnesses) is only relevant to the extent the witness is unavailable in the relevant forums.").

Accordingly, witness convenience does not favor a chance of venue.

e. Location of Books and Records

The Government contends that this factor slightly favors transfer as the custodial facilities of the records needed in this matter are located in Texas. However the location of books and records is not decisive in this matter, as the Government concedes that any documentary evidence related to the matter can be reproduced and transmitted electronically to this Court.

2. Public Interest Factors

   a. Practical Considerations

The Government contends that practical considerations favor a transfer to Texas because allowing the case to remain in New Jersey would impose a substantial burden on the Government witnesses and affect their ability to perform their duties. This Court has already addressed some of these arguments above. This argument also fails to take into account that litigation of this case affects public employees' time regardless of location.

The Government also argues that the matter warrants transfer under this prong because similar cases are already pending in District Courts in Texas. But the fact finding required to adjudicate FTCA claims against ICE and CPB officers is unique to each case. There is little overlap between the allegations in this matter regarding the mistreatment of Ms. Rodriguez Alvarado and A.S.R. in early 2015 and the mistreatment of plaintiffs in the other cases. See Complaint, Amador v. United States, No. 16-595 (S.D. Tex. Apr. 25, 2016), Dkt. No. 1 (alleging mistreatment while plaintiff was in CBP's Rio Grande Valley Sector in August and September 2013); Complaint, Villafuerte v. United States, No. 16-619 (S.D. Tex. Apr. 27, 2016), Dkt. No. 1 (alleging mistreatment against CBP officers in May 2013). Thus, a transfer would not advance practical considerations.

   b. Local Interests and Public Policies

The Government argues that Texas has a strong interest in "deciding controversies involving its border patrol and detention facilities where . . . the events at issue have occurred." Def.'s Br. at 14. This argument again relies on the fact that the events giving rise to this suit occurred in Texas, which has already been addressed above.

Plaintiffs argue that this matter is not of local concern, but instead involves issues of national importance. The Court finds Plaintiffs' arguments to be persuasive. Plaintiffs were held in federal detention centers and allege mistreatment by federal officers in violation of federal policies. Immigration, and the treatment of those who have entered the United States without inspection is a matter of national concern. No Texas laws or policies are implicated by this matter. Courts have found that public interests do not warrant a transfer of venue where issues are national in scope. See Joao Control & Monitoring Systems, LLC v. Ford Motor Co., No. 12-1479, 2013 WL 4496644, at *3 (D. Del. Aug. 21, 2013) (finding that this factor is typically neutral in patent matters involving national corporations). Accordingly, this factor does not favor a transfer.

    c. Courts' Familiarity with Controlling Case Law

Finally, the Government argues that Texas judges are "more likely to have a better knowledge of tort law." Def.'s Br. at 15. But Plaintiffs correctly note that tort law is the only state law involved in this case. Courts have found this factor to be neutral where the only matters of state law involve common law torts or negligence. See Yocham v. Novartis Pharmaceuticals Corp., 565 F. Supp. 2d 554, 560 (D.N.J. 2008) ("Disturbing Plaintiff's choice of forum in order to spare this Court the trouble of interpreting Texas law is simply not called for here."); Flores, 142 F. Supp. 3d at 290 ("Plaintiff's state law tort claims, which sound in common law negligence, are not complex. The court can ascertain Texas law with help from counsel.").

In addition, this matter involves many questions of federal law, including sections of the Immigration and Nationality Act, along with the regulations promulgated under it. Accordingly, this factor does not warrant transfer.

On balance, the Court finds that the Jumara factors related to private interests favor Plaintiffs as their limited means and medical issues would impose an extreme hardship if this case

15

were transferred to Texas. In addition, the Court finds that the public interest Jumara factors are neutral as the case implicates matters of national concern. Accordingly, the Government has failed to satisfy its burden of demonstrating that a transfer would promote the convenience of the parties and witnesses, or that it would be in the interests of justice.

### III. CONCLUSION

For the reasons set forth above, the Government's motion to dismiss or transfer venue, Dkt. No. 17, is **DENIED**. An appropriate Order accompanies this Opinion.

**Dated: May 25, 2017**        */s Madeline Cox Arleo*
                               **MADELINE COX ARLEO**
                               **UNITED STATES DISTRICT JUDGE**